E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
J. JAMARI BUXTON (Cal. Bar No. 342364)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3519/3819
     Facsimile: (213) 894-0141
     E-mail:    jamari.buxton@usdoj.gov
                brian.faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                 UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,               No. 23-CR-133-PA-1

          Plaintiff,                    GOVERNMENT'S SENTENCING POSITION
                                        AND OBJECTIONS TO PRESENTENCE
          v.                            INVESTIGATION REPORT; MEMORANDUM
                                        OF POINTS AND AUTHORITIES; EXHIBIT
MIGUEL ANGEL VEGA,
                                        Hearing Date: December 11, 2023
          Defendant.                    Hearing Time: 8:30 a.m.
                                        Location:    Courtroom of the Hon.
                                                     Percy Anderson

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys J. Jamari Buxton and

Brian R. Faerstein, hereby files its sentencing memorandum and

objections to the Presentence Investigation Report for defendant

Miguel Angel Vega.

//

//

//

This sentencing memorandum is based upon the attached memorandum of points and authorities and accompanying exhibit, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 20, 2023          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____
J. JAMARI BUXTON
BRIAN R. FAERSTEIN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   DEFENDANT'S OFFENSE CONDUCT...................................4

III.  THE ADVISORY GUIDELINES RANGE................................7

      A.    USPO's Calculation and Recommendation...................7

            1.    Offense Level.....................................7

            2.    Criminal History Category.........................7

            3.    Advisory Guidelines Range.........................8

IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION...................8

      A.    The Nature and Circumstances of the Offense............8

      B.    History and Characteristics of Defendant..............11

      C.    Deterrence............................................12

      D.    Need to Reflect Seriousness of Offense, to Promote
            Respect for the Law, and to Provide Just Punishment
            for the Offense.......................................13

      E.    Avoidance of Unwarranted Sentencing Disparities.......13

      F.    Victim Impact.........................................14

      G.    Restitution...........................................15

      H.    Objections/Corrections to the PSR.....................15

V.    CONCLUSION..................................................17

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Gall v. United States,

  552 U.S. 38 (2007) ............................................ 13

Molina-Martinez v. United States,

  136 S. Ct. 1338 (2016) ...................................... 13

United States v. Carty,

  520 F.3d 984 (9th Cir. 2008) ................................. 8

United States v. Rita,

  551 U.S. 338 (2007) ......................................... 13


**Statutes**

18 U.S.C. § 16.............................................. 16

18 U.S.C. § 371............................................. 16

18 U.S.C. § 3553....................................... passim

18 U.S.C. § 3663....................................... 15, 16

18 U.S.C. § 3663A...................................... 15, 16


**Other**

U.S.S.G. § 2H1.1......................................... 7, 17

U.S.S.G. § 3C1.1............................................ 7

U.S.S.G. § 4C1.1....................................... 12, 17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Of all public officials, law enforcement officers have perhaps the most concrete and pervasive impact on people's day-to-day lives. They patrol our neighborhoods and cities; they respond to emergencies; they investigate crimes; and they give people a sense of security so that people can go about their lives with the knowledge that law enforcement is safeguarding our society.  Indeed, most people see or come into contact with some type of law enforcement officer virtually every week, if not every day.  The omnipresence of law enforcement is deliberate, seeking to foster a sense of security, and in this way, law enforcement is one of the core components of our government.

To discharge their critical duties to protect and serve the public, law enforcement officers are afforded immense powers and discretion.  These include the power to deprive people of liberty, to seize property, and to initiate criminal charges against people when warranted.  These powers come with great responsibility, and law enforcement officers who abuse them for personal gain, or to harm others, put both the public and our larger system of government at great risk.  Because if people cannot have confidence in law enforcement -- if they do not believe officers abide by the law and discharge their duties with respect, restraint, and principle -- the public may just as soon lose faith in other (or all) institutions of government.

Defendant Miguel Angel Vega, a former Los Angeles County Sheriff's Department ("LASD") deputy, is one of the small but increasingly prevalent group of law enforcement officers who have

1

abused their powers to harm others.  Enraged that a 23-year-old skateboarder named J.A. implored him and his partner to stop harassing two young African American males on April 13, 2020, defendant (along with his partner and co-defendant Christopher Blair Hernandez) exploited his authority as a deputy to terrorize and teach J.A. a lesson.  Defendant seized J.A. from a Compton skatepark without any lawful basis, confined J.A. inside the deputies' patrol vehicle, and, as they drove around, taunted and threatened to beat up J.A. and to drop off J.A. in gang territory so that others could assault J.A.  Although this nightmarish episode out of a movie could have ended there (albeit after defendant's initial abuse of power), defendant proceeded to initiate a high-speed chase with J.A. trapped (unbuckled no less) in the back of the patrol vehicle, which ended soon after when defendant crashed the vehicle into a brick wall.  As a result, J.A.'s face struck the interior of the vehicle and J.A. sustained a sizeable cut above J.A.'s eye requiring stitches.

Recognizing he had no legal justification to arrest J.A., defendant immediately released J.A. and directed him to "get the fuck out" of the area, lest others discover what defendant had done.  But when responding LASD deputies unwittingly re-arrested J.A. a short time later, defendant and his partner quickly pivoted, fabricating a story designed to mask their unlawful conduct: namely, that the deputies had arrested J.A. because J.A. exhibited symptoms of a person under the influence of a stimulant, even though J.A., who does not use drugs, showed no such signs and was completely sober.  As part of the ensuing cover-up, defendant and his partner lied to a LASD supervisor to prevent a larger investigation, caused another

deputy to issue a sham citation to J.A. as J.A. was receiving treatment at a hospital to repair J.A.'s face, and then drafted multiple incident reports replete with lies, omissions, and misstatements.  In so doing, defendant eroded the public's trust in law enforcement and in the larger government of which law enforcement is an integral part.

Defendant has since pled guilty to depriving J.A.'s constitutional rights under color of law and faces sentencing in several weeks.  The government agrees with the Guidelines calculations applied by the United States Probation and Pretrial Services Office (the "USPO") in its Presentence Investigation Report (Dkt. No. 53 ["PSR"]), which finds that defendant has a total offense level of 17 and a criminal history category of I, yielding an advisory Guidelines range of 24-30 months in prison.  (PSR ¶¶ 63, 68, 113.)  Weighing the various aggravating and mitigating facts of this case, and the broader goals of sentencing, the government respectfully recommends the following sentence: (1) a 24-month term of imprisonment; (2) a 3-year term of supervised release; (3) a fine to be determined by the Court;[1] and (4) a special assessment of $100.  As discussed in detail below, the government's recommended sentence appropriately balances the sentencing factors articulated in Title 18, United States Code, Section 3553(a) and is sufficient but not greater than necessary to comply with the purposes of sentencing.

---

[1] In the PSR, the USPO recommends a fine of $10,000.  (PSR ¶ 109.)

3

## II.   DEFENDANT'S OFFENSE CONDUCT[2]

Before he was fired for his unlawful conduct, defendant was a deputy with the LASD.  Around 2:30 p.m. on April 13, 2020, defendant and his partner, co-defendant Hernandez, were patrolling the area near Wilson Park in Compton, not far from LASD's Compton Station, in their patrol SUV as part of their official duties.  Near the border of the park, just outside an enclosed skatepark where J.A. was skateboarding with his friends, defendant and Hernandez spotted and approached two young African Americans males, directing them to lift their shirts.

From inside the skatepark, J.A. exercised his First Amendment rights by yelling at defendant and Hernandez to leave the African American males alone.  Enraged and pumped-up on steroids, which made him "angry and short-tempered" (see PSR ¶ 97), defendant screamed at J.A. to "shut the fuck up" and challenged J.A. to a fight, even though J.A. -- like everyone else inside the enclosed skatepark -- was not threatening defendant and Hernandez and posed no risk whatsoever to them.  After taking a moment to move the patrol vehicle closer to an opening in the skatepark fence, defendant, still enraged, summoned J.A. to the opening, grabbed J.A., and confined J.A. inside the patrol vehicle as Hernandez looked on, even though J.A. had not done anything wrong, much less committed a crime. Because there was no legal basis to seize and imprison J.A. -- indeed, the goal was to teach J.A. an unnecessary and unwarranted

---

[2] Unless otherwise indicated, all facts herein are drawn from the Factual Basis contained in the parties' plea agreement.  (Dkt. No. 50 at 17-27.)

1    lesson -- defendant and Hernandez did not bother to handcuff J.A.,

2    advise J.A. of J.A.'s rights, or even secure J.A.'s seatbelt.

3          Mystified onlookers inside the skatepark began filming the

4    illegal imprisonment, prompting defendant to flee the area with J.A.

5    still trapped in the patrol vehicle.  As defendant drove away,

6    defendant and Hernandez began to intimate and scare J.A. through

7    repeated taunts and threats.  Among others, the deputies stated that

8    they were going to beat up J.A. and said that they would drop off

9    J.A. in gang territory so that others could attack J.A. as well.

10   Mindful that he and Hernandez were committing a crime by falsely

11   imprisoning J.A., defendant also began to concoct a pretextual story

12   -- which he signaled to Hernandez -- that the deputies had suspected

13   J.A. of being under the influence of a stimulant, justifying the

14   detention.

15         Soon after, defendant spotted and began chasing a young male on

16   a bicycle whom defendant claimed had a firearm, even though J.A. was

17   still unbuckled and confined in the back of the deputies' SUV.  The

18   chase led defendant through an alley, where defendant slammed the SUV

19   into a brick wall and another parked vehicle while trying to pursue

20   the bicyclist at an unsafe speed.  J.A. sustained a large cut above

21   J.A.'s eye during the collision, an injury for which J.A. would later

22   require stitches.  But instead of checking to see whether J.A. needed

23   medical attention, defendant -- realizing the even greater magnitude

24   of trouble he was going to be in if the unlawful arrest were

25   discovered -- quickly elected to "kick" J.A., telling J.A. to "get

26   the fuck out" of the area.  J.A. complied, eliminating -- at least

27   for the moment -- the key evidence of defendant and Hernandez's

28

crime.  Fate stepped in, however, and soon after another LASD deputy responding to the area to look for the purported gun suspect re-arrested J.A. around the corner and down the block from the site of the collision.  Defendant learned of the (incorrect) arrest of a potential gun suspect, saw that J.A. was the person in custody, and tried to persuade his colleagues to kick J.A. again, to no avail.  When that did not work, defendant went back to his original plan, which involved framing J.A. for a crime J.A. did not commit to cover-up defendant and Hernandez's own unlawful conduct.

Specifically, defendant and Hernandez lied to a supervisor to ward off a larger investigation into their actions, concealing that they had arrested J.A. at the skatepark and that J.A. had been in the back of the patrol SUV during the collision.  Once these undeniable facts became known, defendant lied again to the supervisor, stating that he had arrested J.A. because J.A. was under the influence of a stimulant.  Fully on board with the cover-up, Hernandez took defendant's lead and caused another deputy to issue J.A. a citation at the hospital for being under the influence of methamphetamine.  Defendant and Hernandez then memorialized and solidified the false story by drafting multiple incident reports filled with lies, omissions, and misleading statements designed to justify their misconduct.  Defendant and Hernandez went into great detail in fabricating their story.  For instance, they wrote, falsely, that before seizing and falsely imprisoning J.A. at the skatepark, the deputies observed J.A. exhibiting signs of being under the influence of a stimulant, such as profuse sweating, rapid speech, muttering unknown words, erratic behavior, teeth grinding, heavy breathing, and

dilated pupils; that J.A. had threatened to harm them and others; that onlookers at the skatepark moved toward their patrol SUV, requiring the deputies to flee quickly without handcuffing J.A. or securing J.A.'s seatbelt; and that, after the collision, defendant checked J.A. for injuries and transferred J.A. to another patrol unit.  Defendant knew these were all lies, and he told them to protect himself, all at the expense of J.A. and the integrity of his position as a law enforcement officer sworn to protect the public.

## III.  THE ADVISORY GUIDELINES RANGE

### A.    USPO's Calculation and Recommendation

#### 1.    <u>Offense Level</u>

The USPO issued its PSR in November 2023.  Consistent with the parties' plea agreement (Dkt. No. 50 at 7), the USPO found in the PSR that the following sentencing Guidelines factors apply:

| | | |
|---|---|---|
| Base offense level: | 12 | [U.S.S.G. § 2H1.1(a)(2)] |
| Defendant was a public official at the time of the offense; offense was committed under color of law: | +6 | [U.S.S.G. § 2H1.1(b)(1)] |
| Obstructing or impeding the administration of justice: | +2 | [U.S.S.G. § 3C1.1] |
| Acceptance of responsibility: | -3 | [U.S.S.G. § 3E1.1] |
| <u>Total offense level:</u> | <u>17</u> | |

(PSR ¶¶ 45-63.)

#### 2.    <u>Criminal History Category</u>

The PSR indicates that defendant has no criminal history points, yielding a score of zero and a criminal history category of I.  (<u>Id.</u> ¶¶ 65-68.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3.    Advisory Guidelines Range

Based on a total offense level of 17 and a criminal history category of I, the resulting advisory Guidelines range is 24-30 months.  (Id. ¶ 113.)  The government agrees with the USPO's calculation of defendant's Guidelines range.  As explained below, the government recommends a sentence of 24 months' imprisonment, representing the low-end of that range.

**IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The government's recommended sentence of 24 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008).  A 24-month term of imprisonment is a meaningful custodial sentence that accounts for the seriousness of defendant's crime, furthers the need for deterrence, promotes respect for the law, and provides just punishment; by the same token, it appropriately accounts for mitigating facts in defendant's personal history and characteristics and avoids unwarranted sentencing disparities.  See 18 U.S.C. § 3553(a).

**A.    The Nature and Circumstances of the Offense**

A powerful official sworn to protect and serve the public, defendant completely disregarded these duties and instead used his powers to intimidate, threaten, and punish a 23-year-old skateboarder who dared to question defendant's aggressive policing tactics. Rather than ignore J.A.'s comments -- or, better yet, leave the park altogether, because no crime had been committed by anyone -- defendant chose to take out his steroid-fueled rage on J.A. and teach J.A. a lesson that J.A. and others would not soon forget.  Indeed, by

8

seizing and falsely imprisoning J.A. in the back of the patrol vehicle, defendant was sending a message not just to the onlookers at the park, but also to the larger community and anyone else who dared to question law enforcement: speak too loudly and there will be consequences.

But that was just the tip of the iceberg.  Defendant taunted J.A. for being (understandably) afraid and threatened to beat up J.A. Defendant also threatened to drop off J.A. in gang territory, where equally-if-not-even-more-menacing actors would brutalize J.A. Perhaps defendant would have made good on his threats had he not then spotted and, in yet another ill-advised decision, proceeded to chase after a suspicious-looking (to defendant) bicyclist with J.A. still trapped in the back of the patrol vehicle.  That chase was short-lived, ending in a violent crash in which J.A. sustained a large cut above J.A.'s eye, adding injury to insult.  Instead of checking to see whether J.A. needed medical attention (J.A. did), defendant immediately turned to self-preservation mode, directing J.A. to flee the scene so that others would not discover his misconduct.  Then, when another deputy re-arrested J.A. soon after, and defendant eventually learned of it, defendant put into action the fake story that he first conceived in the patrol vehicle: falsely claiming that J.A. had been under the influence of a stimulant.

This bald-faced lie became the centerpiece of the defendant and his partner's cover up.  Defendant told it to his supervisor to keep himself and his partner out of trouble; it was the basis for a citation another deputy issued to J.A. at the hospital where J.A. was being treated for injuries caused by defendant; and it was featured

among a slew of other lies defendant and his partner manufactured and presented as fact in two fabricated incident reports, including that J.A. had threatened the deputies and others at the skatepark (J.A. did not), and that the crowd of onlookers moved toward the patrol vehicle as it drove away (they did not), justifying the deputies' failure to secure J.A. in the vehicle before they left the park.

Defendant's above-described conduct falls into two distinct categories, each of which is significant and erodes the public's trust in law enforcement and in government more broadly.  First, defendant -- a sworn law enforcement officer -- deliberately broke the law.  Defendant seized and falsely imprisoned someone not because they had committed a crime, but because he was angry and he wanted to teach them a lesson.  To carry out that lesson, defendant used threats, intimidation, and fear.  In so doing, defendant transformed himself into a powerful (and armed) vigilante, something any reasonable person should fear.

Second, defendant exploited his position to cover up a crime, telling deliberate lies to protect himself and his partner and incriminate an innocent person.  This cuts to the very core of our criminal justice system.  For if the public cannot take its law enforcement officers at their word, the system that relies on those officers has no legitimacy whatsoever.

In short, the nature and circumstances of defendant's conduct and his abuse of power are very grave considerations in this case and warrant a within-Guidelines sentence.

**B.   History and Characteristics of Defendant**

While the nature and circumstances of the offense are clearly aggravating, the PSR also notes several mitigating facts in this case.  See 18 U.S.C. § 3553(a)(1).  On balance, these facts do not warrant any variance, but they do, in the government's view, support its recommended low-end Guidelines sentence of 24 months.

As a child, defendant's parents divorced, severing the family. (See PSR ¶ 76.)  Defendant's mother and sister were eventually homeless, and his mother and aunt experienced traumatic personal issues that no doubt affected defendant for years to come.  (See id. ¶ 77.)  Despite these issues, defendant became a functional adult and pursued a career in law enforcement.  But to compete with his peers, and have an "edge while on patrol," defendant began using steroids, which made him "angry and short tempered" and likely clouded his judgement (though did not excuse his conduct).  (See id. ¶ 97.)  It is no surprise that defendant committed the instance offense in the midst of his rampant steroid use.

Since his offense conduct, defendant has experienced both mental health and substance abuse issues, which he has sought to address. (See id. ¶¶ 92-96.)  Even so, defendant has worked to better himself, obtaining his associate's degree in computer science, and he is currently working on a bachelor's degree in the same field, reportedly one year away from obtaining that degree.  (See id. ¶¶ 99-100.)  With these degrees, defendant apparently intends to pursue a career in coding or information technology, and he also appears to have the stability and support of his immediate and extended family.

1  (See id. ¶¶ 84, 86-87.)[3]

2        Based on these mitigating facts, the government recommends a

3  low-end sentence.

4        **C.    Deterrence**

5        Perhaps more than most other crimes, there is a unique

6  opportunity for deterrence in this case.  See 18 U.S.C.

7  § 3553(a)(2)(B).  As discussed above, law enforcement officers wield

8  considerable power over people's lives and must excise that power --

9  whether it be arresting, charging, or imprisoning people or taking

10 their property -- responsibly, solemnly, and consistent with the law.

11 If left unchecked, other law enforcement officers might seek to use

12 their power, like defendant, to harm others or for personal gain.  A

13 meaningful custodial sentence in this case will send a message that

14 there are serious consequences for this serious conduct.  And because

15 the group of would-be wrongdoers -- i.e., law enforcement officers

16 who are entrusted with these immense powers -- is so specific, and

17 because these types of civil rights prosecutions are so rare, there

18 is little doubt the cohort group will receive that message.  At the

19 same time, a meaningful custodial sentence will send a message to the

20 public that no one, including law enforcement officers, is above the

21 law, which might help to restore some of the faith in government that

22 defendant's conduct has eroded.

23

24 _____

25       [3] While defendant does not have any previous criminal history
   points, that mitigating fact is already taken into account by virtue
26 of defendant's criminal history score.  And as discussed below,
   defendant does not qualify for the new two-level reduction for zero-
27 point offenders under U.S.S.G. § 4C1.1 because his crime is a civil
   rights offense and because he used threats of force as part of the
28 offense.

1          **D.    Need to Reflect Seriousness of Offense, to Promote Respect
2                  for the Law, and to Provide Just Punishment for the Offense**

3          As explained above, defendant's conduct is serious and both
4     harms the public and undermines our larger system of government.
5     People who commit this offense must be punished commensurate with the
6     seriousness of the crime and in a manner that encourages others --
7     i.e., fellow law enforcement officers -- to respect and comply with
8     the law (their sworn duty).  See 18 U.S.C. § 3553(a)(2)(A).  A
9     within-Guidelines sentence here would have the added sentencing
10    benefit of promoting respect for the law amongst the public at large,
11    advancing the paradigm that no one is above reproach.  The 24-month
12    term of imprisonment recommended by the government here accomplishes
13    these goals.

14         **E.    Avoidance of Unwarranted Sentencing Disparities**

15         A within-Guidelines sentence helps avoid unwarranted sentencing
16    disparities among defendants with similar criminal backgrounds who
17    commit similar offenses.  See 18 U.S.C. § 3553(a)(6).  The advisory
18    Guidelines range provides the "starting point and . . . initial
19    benchmark" for this Court's consideration of an appropriate sentence.
20    Molina-Martinez v. United States, 136 S.Ct. 1338, 1345 (2016)
21    (quoting Gall v. United States, 552 U.S. 38, 49 (2007)).  Although
22    the Guidelines are not binding, they "reflect a rough approximation
23    of sentences that might achieve section 3553(a)'s objectives."
24    United States v. Rita, 551 U.S. 338, 350 (2007).  For this reason
25    also, the government recommends a low-end sentence of 24 months.

26
27
28
                                        13

1

### F.   Victim Impact

2      J.A.'s Victim Impact Statement, attached as Exhibit A,

3  underscores the seriousness of defendant's conduct and echoes and

4  personalizes many of the considerations above about how law

5  enforcement misconduct profoundly harms individuals and undermines

6  the public's belief in the larger institution.

7      J.A. says that the "catastrophe" J.A. experienced was something

8  out of a movie.  J.A. talks about the "trauma" he experienced as a

9  result of defendant and his partner's actions, which robbed young

10  J.A. of J.A.'s "motivation and spirit."  After being falsely

11  imprisoned by defendant, J.A. seemingly "lost [them]self" and a

12  feeling of emptiness took over.  Routinely experiencing sudden bouts

13  of anger, J.A. stopped socializing with family and friends and would

14  withdraw from the world so that J.A. could be alone to grapple with

15  J.A.'s complicated feelings.  J.A. also talks about struggling to

16  understand why defendant and his partner did what they did to J.A.

17  To this day, J.A. says that J.A. is "still working on getting

18  comfortable being in public places."

19      J.A. says that J.A., a passionate skateboarder, grew up going to

20  the skatepark where J.A. was falsely imprisoned by defendant to <u>get</u>

21  <u>away</u> from trouble that lurked in that area.  It was a refuge of sorts

22  where J.A. and others like J.A. built a peaceful and safe "community"

23  rooted in their common interests.  That is no longer the case after

24  defendant's illegal conduct.

25      Speaking to the broader harm defendant's crime caused, J.A.

26  states as follows: "I don't stand here to hate those who protect

27  [and] serve our communities as they should.  I stand here to say that

28

14

there are a lot of people like Hernandez [and] [defendant] . . .
[t]hat do not know how to de-escalate or show proper intentions in a
situation of despair." J.A. explains that law enforcement officers
like defendant should "[a]lways think twice before taking action to
do something [they will] end up regretting[,] [because] it is not
just a particular individual that [they are] hurting . . . [b]ut a
community that cares as well."

G. **Restitution**

Although restitution is not mandatory in this case because
defendant's offense of conviction did not constitute a crime of
violence, an offense against property, or another qualifying offense,
see 18 U.S.C. §§ 3663A(a)(1), (c), the government is mindful of the
Court's ability to make victims whole through restitution, see 18
U.S.C. § 3663, and that "the need to provide restitution to any
victims of the offense" is one of the goals of sentencing. See 18
U.S.C. § 3553(b)(7). Having said that, J.A. entered into a
confidential settlement agreement with the County of Los Angeles that
covered injuries and expenses sustained by J.A. by virtue of
defendant's conduct. To date, J.A. has not informed the government
of any additional uncovered expenses J.A. has incurred because of
defendant. Accordingly, the government is not aware of any
restitution in this case at this time.

H. **Objections/Corrections to the PSR**

As previously explained, the government agrees with the USPO's
advisory Guidelines calculations set forth in the PSR in this case.
Nonetheless, the government provides several corrections or
clarifications with respect to the PSR as follows:

15

- Paragraphs 8 through 10 list the counts that are to be dismissed at the conclusion of defendant's sentencing (assuming defendant complies with his obligations under the parties' plea agreement).  However, paragraph 8 incorrectly lists Count 2 -- the count to which defendant pleaded guilty -- as being among the counts that the government will move to dismiss.  Paragraph 8 instead should state: "Count 1 alleges a violation of 18 U.S.C. § 371: Conspiracy."  In addition, paragraph 10 should refer to both Counts 4 and 5 (as opposed to just Count 4).

- The PSR incorrectly states in paragraphs 41 and 125 that the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A, applies to the offense of conviction in this case. As previously noted, none of the enumerated grounds or offenses for applying the MVRA are present in this case, see 18 U.S.C. §§ 3663A(a)(1), (c), including the ground of a crime of violence as defined in 18 U.S.C. § 16.  Thus, the non-mandatory restitution provisions of 18 U.S.C. § 3663 apply here instead.  In addition, the government previously provided the USPO with information about J.A.'s confidential settlement agreement with the County of Los Angeles that covered injuries and expenses sustained by J.A. by virtue of defendant's conduct, at least as of the time of the settlement.

- The government agrees with the USPO that the Zero-Point Offender Reduction in the Guidelines does not apply to defendant.  However, the government submits the principal

16

reason the reduction does not apply is because the instant offense of conviction is covered by U.S.S.G. § 2H1.1 (Offenses Involving Individual Rights), as set forth in U.S.S.G. § 4C1.1(8), in addition to defendant having used credible threats of violence in connection with the offense, U.S.S.G. § 4C1.1(3).

- With respect to the PSR's summary of "The Offense Conduct" in paragraphs 14 through 40, the government respectfully requests that the USPO incorporate the facts set forth in the following paragraphs from defendant's Factual Basis in the parties' plea agreement (see Dkt. No. 50 at Attachment A): paragraph 10 (to replace paragraph 26 in the PSR); paragraph 13; paragraph 16; and paragraph 19.

- With respect to paragraph 17 of the PSR's summary of "The Offense Conduct," the third sentence should be revised to state "one of whom **Vega** believed was associated with a street gang" instead of "one of whom **Hernandez** believed was on probation."

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence: (1) a 24-month term of imprisonment; (2) a 3-year term of supervised release; (3) a fine to be determined by the Court; and (4) a special assessment of $100.

17